IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. TDC-21-454 |
| | * | |
| OLUWASEYI AKINYEMI, | * | |
| | * | |
| Defendant | * | |
| | * | |
| | * | |
| ******* | | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, hereby submits the Government's Memorandum in Aid of Sentencing. Defendant Oluwaseyi Akinyemi ("Akinyemi") is scheduled to be sentenced on April 29, 2022, at 10:00 a.m. For the reasons set forth below, the Government submits that a sentence of **78 months in prison, followed by 3 years of supervised release**, is a sentence sufficient but not greater than necessary to satisfy the goals of sentencing.

**I.    Background**

On April 5, 2021, the Defendant was charged via criminal complaint with Mail Fraud and Attempted Mail Fraud, in violation of 18 U.S.C. § 1341, and Conspiracy to Commit Mail Fraud, in violation of 18 U.S.C. § 1349. (ECF No. 1.) The Defendant had his initial appearance on the criminal complaint on April 16, 2021. (ECF No. 4.) The Defendant initially consented to detention, (ECF No. 8), and was later detained by U.S. Magistrate Judge Timothy J. Sullivan pending trial, (ECF No. 18). On November 17, 2021, Akinyemi was charged via Information with Conspiracy to Commit Mail Fraud, in violation of 18 U.S.C. § 1349, and Mail Fraud, in violation of 18 U.S.C. § 1341. On December 20, 2021, the Defendant plead guilty to the two counts of the

Information.  (ECF No. 26.)  After accepting the Defendant's plea to these counts and adjudging him guilty, the Court scheduled sentencing for April 11, 2022, at 11 a.m., which was later rescheduled to April 29, 2022, at 10 a.m.  (ECF Nos. 31, 32.)  The Court directed the U.S. Probation Office ("Probation") to prepare the Pre-Sentence Investigation Report ("PSR"), which was filed on February 16, 2022.  (ECF No. 33 ("PSR").)

Pursuant to a written plea agreement entered on December 20, 2021, the parties agreed that the base offense level was **7**.  (ECF No. 28 ("Plea") ¶¶ 6(a).)  A **14**-level increase applied because the amount of loss involved in the offense was more than $550,000 but not more than $1,500,000; a **4**-level increase applied because the offense resulted in substantial financial hardship to five or more victims; a **2**-level increase applied because the offense involved a misrepresentation that the Defendant was acting on behalf of a government agency; and a **2**-level increase applied because a substantial part of the fraudulent scheme was committed from outside the United States.  (*Id.* ¶¶ 6(b)-(e).)  Accordingly, the combined offense level is **29**.  (*Id.*)  The Government did not oppose a **2**-level reduction for acceptance of responsibility, and the Government agreed to move for an additional **1**-level reduction in recognition of the Defendant's timely notification of his intention to enter a plea of guilty.  (*Id.* ¶ 6(f)).  The final offense level is therefore **26**.

Probation's calculation of the offense level also includes a **2**-level increase pursuant to U.S.S.G. § A1.1(b)(1), because the offense involved the Defendant and his co-conspirators knowingly targeting vulnerable, elderly victims.  (PSR ¶ 37.)  The Government submits that Probation has correctly applied this enhancement and that the total offense level of **28**, as calculated by Probation, is correct. However, the Government will limit its sentencing recommendation consistent with the offense level agreed upon in the plea agreement.  *See United States v. Edgell*, 914 F.3d 281, 288 (4th Cir. 2019).  The parties did not reach agreement as to the

Defendant's criminal history. The Government agrees with Probation's calculation that the Defendant's criminal history score is **0** and his criminal history category is therefore **I**. The United States Sentencing Guidelines (the "Sentencing Guidelines") prescribe a sentence in the range of 63 months to 78 months.

## II.      Legal Standard

In *United States v. Green,* 436 F.3d 449 (4th Cir. 2006), the Fourth Circuit held that after *United States v. Booker,* 543 U.S. 220 (2005), which made the Sentencing Guidelines effectively advisory, the district court is commanded to fulfill congressionally established objectives for sentencing set out in 18 U.S.C. § 3553(a): promoting respect for the law; providing just punishment for the offense; affording adequate deterrence; protecting the public from further criminal activity of the defendant; providing the defendant training, medical care, and correctional treatment; and providing restitution to victims. *See Green,* 436 F.3d at 455; *see also United States v. Moreland,* 437 F.3d 424, 432 (4th Cir. 2006).

Thus, in conducting a sentencing, district courts must (1) calculate the sentence range recommended by the Sentencing Guidelines; (2) determine whether a sentence within that range and within statutory limits serves the statutory sentencing factors set out in 18 U.S.C. § 3553(a) and, if not, select a sentence that does serve those factors; (3) implement mandatory statutory limitations; and (4) articulate the reasons for selecting the particular sentence, especially explaining why a sentence outside of the Sentencing Guidelines range better serves the relevant statutory sentencing purposes. *See Green,* 436 F.3d at 455-56; *Moreland,* 437 F.3d at 432. The explanation of a variant sentence must be tied to the factors set forth in § 3553(a) and must be accompanied by findings of fact as necessary. *See Green,* 436 F.3d at 455-56; *United States v. Perez-Pena,* 453 F.3d 236, 241 (4th Cir. 2006). The district court is given "some latitude," and "a

degree of deference," to tailor a particular sentence to the circumstances. *Green,* 436 F.3d at 456-57; *Moreland,* 437 F.3d 433.

**III.     Relevant Sentencing Considerations Under 18 U.S.C. § 3553(a)**

The breadth of Akinyemi's criminal conduct necessitates a sentence at the high-end of the Sentencing Guidelines range. Akinyemi was an integral part of this social media-based scheme, responsible for receiving funds from victims and forwarding a portion of these funds to his co-conspirators in Nigeria. Even after law enforcement executed a search warrant at his residence for this scheme, Akinyemi continued to engage in fraudulent criminal activity, shifting his fraud to obtaining unemployment and COVID-19 related benefits. To continue his fraud, the Defendant used the home address of an at-home nursing care client to receive fraudulent unemployment insurance debit cards. The brazenness of Akinyemi's criminal conduct, the fact that he repeatedly and knowingly chose to violate the law, and that he persisted in this conduct even after he knew that law enforcement was investigating him, demonstrates why a serious and significant sentence is necessary and appropriate in this case.

  A. Akinyemi's Integral Role in the Social Media-Based Fraud Scheme

As the domestic recipient of the victims' funds, Akinyemi played an important role in the scheme. Social media schemes like the instant one need a United States-based co-conspirator in order to provide an air of legitimacy to the scheme. After all, putative victims would be wary about sending their cash, gift cards, or electronics directly to individuals in a foreign country. As the domestic representative of the scheme, the Defendant was a willing and knowing participant of the scheme.

Victims sent significant amounts of money to Akinyemi—Victim 1 alone sent between approximately $70,000 to $80,000 to Akinyemi's alias, Paddy Linkin. (Plea at 11.) These

victims—elderly individuals duped into believing they were applying for and receiving federal funds or proceeds from contests—sent communications with their enclosed monies stating the purpose for which they were sending the funds. For example, Victim 2 sent a letter with an enclosed check in the amount of $1,500 to Akinyemi. The accompanying note stated, "This is a check for my winnings of 100,000 cash money." (ECF No. 1-1 ¶ 18.) When Akinyemi reported to his co-conspirators that Victim 2 had sent a check, a member of the conspiracy told Victim 2 that the purported contest for which she was sending money would not accept a check and required cash. (Plea at 11.) Victim 2 proceeded to send that cash, which was intercepted by law enforcement. (*Id.*) Akinyemi also communicated with his co-conspirators when he did not receive funds. For example, co-conspirators who were in touch with the victims would send screenshots to Akinyemi updating him on when packages were sent and whether the victim followed the co-conspirator's directions—in other words, preparing Akinyemi for what to expect. (ECF No. 1-1 ¶ 37.) When Akinyemi did not receive packages from a particular victim, co-conspirators sent him screenshots of messages from the victims confirming that the fraud proceeds had been sent to Akinyemi's alias. (*Id.* ¶ 39.) Finally, co-conspirators sent messages from victims who were worried about their lost money—showing Akinyemi's full and deep involvement in this scheme. (*Id.* ¶ 38.) This social media fraud was an operation that needed a feedback loop between the victims and the co-conspirators in Nigeria. Akinyemi provided the necessary link to ensure that victims would continue to send money—enriching Akinyemi and his co-conspirators at the victims' expense.

Akinyemi participated in this conspiracy for profit. In a WhatsApp conversation on Akinyemi's phone, which was between Akinyemi and a co-conspirator, the co-conspirator informed Akinyemi that Victim 3 would be sending $9,770 to Akinyemi's residence. (ECF No.

1-1 ¶ 25.) Akinyemi remarked with exclamation and then stated in code that Akinyemi would deduct a certain percentage of the money as his fee, before sending the rest to his co-conspirators. (*Id.* ¶ 26.) Akinyemi also instructed co-conspirators to use his "Paddy Linkin" alias and told them to have the victim use FedEx when sending money—in this case $27,000. (*Id.* ¶ 41.) When law enforcement searched Akinyemi's phone, they recovered a photograph of a ledger depicting amounts collected, outstanding, and totals. (ECF No. 1-1 ¶ 40; Ex. A.) The Defendant was no mere money mule. He was an integral part of this wide-ranging and long-running social media scam—coordinating payments from the victims for effective delivery to him, taking a cut for himself, and sending the remaining sums to his co-conspirators in Nigeria.

The total losses attributable to this complex and highly orchestrated social media scheme was $478,145.07.

      B.      <u>Akinyemi's Shift to Conducting Benefits Fraud</u>

On April 25, 2019, law enforcement executed a search warrant at the Defendant's residence. (Plea at 13.) After waiving his *Miranda* rights, the Defendant admitted to being informed about arriving packages from Nigerian co-conspirators (including tracking numbers and amounts) and receiving packages from victims. (*Id.*) Showing his knowledge of the scheme, Akinyemi admitted that Nigerian co-conspirators were responsible for duping the victims to send money to him in Maryland. (*Id.*)

Approximately a year later, the COVID-19 pandemic hit. The Defendant took advantage of these changed circumstances to start a new fraud scheme—this time focusing on government aid for the unemployed. The Defendant used his residence as the mailing address in order to receive fraudulent unemployment insurance debit cards. Ten Maryland Pandemic Unemployment Assistance ("PUA") claims were filed with the State of Maryland using Akinyemi's residence as

the mailing address for the debit cards. Out of the ten claims, three resulted in debit cards being sent to Akinyemi. (Plea at 14.)

When law enforcement executed a second search warrant at Akinyemi's new residence and vehicle—approximately two years after the first warrant—law enforcement recovered two Arizona unemployment insurance debit cards in the names of victims. (*Id.* at 15.) At that time, Akinyemi was working as a caretaker for elderly individuals. Continuing his *modus operandi* of taking advantage of the elderly, the Defendant used the Washington, D.C. address of an elderly client (to whom he provided at-home nursing care) to receive these fraudulent unemployment insurance debit cards. (*Id.*) Further investigation revealed that in total nine Arizona unemployment insurance claims were filed using the elderly client's D.C. address. (*Id.*) Because Maryland and Arizona flagged a majority of these claims as fraudulent, the actual loss was $7,974 with an intended loss of over $250,000 in state and federal benefits. (*Id.*)

      C.      <u>The Necessity for the Requested Sentence</u>

The actual and intended losses caused by the Defendant as part of his fraud schemes evidence the seriousness of the offense. As a result of the social media fraud scheme, at least thirteen victims—many in their 60s and 70s—lost tens of thousands of dollars to this scheme. The Defendant and his co-conspirators prayed on these elderly victims, impersonating their actual friends to gain and then betray their trust. And once they had their hooks in, the Defendant was responsible for ensuring that the scheme remained profitable for the co-conspirators, as he received the ill-gotten proceeds from the elderly victims and funneled them to his Nigerian co-conspirators, taking his cut of the proceeds.

The scheme was a long-ranging and far reaching one and the financial and mental effects it had on its victims were disastrous. Victims write about the financial distress caused by the

scheme, with credit scores ruined, an inability to make ends meet and pay bills, including medical treatments, and at least one victim declaring bankruptcy. (*See, e.g.,* ECF Nos. 36, 36-5, 36-10, 36-15, 36-20.)  Consistent with their targeting of elderly victims, almost all of the victims describe how they lost their retirement savings. (*See, e.g.,* ECF Nos. 36-13, 36-14.)  For these victims, this scheme destroyed their financial independence. (*See, e.g.,* ECF Nos. 36-11.)  Mentally, one of the victims states that this scheme deprived them of "feeling safe with people in the world around [them]" and describing how they are "full of fear and distrust." (*See* ECF No. 36-2.)  They and other victims describe their feelings of shame, embarrassment, anger, anxiety, and depression because of the Defendant's criminal conspiracy. (*See, e.g.,* ECF Nos. 36-3, 36-8, 36-13, 36-14, 36-17.)  Preyed upon via social media, victims now fear using the computer. (*See* ECF Nos. 36-2, 36-6.)  Financial ruin and broken familial and social relationships were left in the wake of the Defendant's fraud scheme. (*See, e.g.,* ECF Nos. 36-1, 36-2, 36-5.)  Just punishment based on the serious harm caused to the victims necessitates a high-end of the Guidelines sentence.

The Defendant's history and characteristics demonstrate that this was a crime of greed. Unlike most defendants that come before this Court, the Defendant's childhood was "fine" and he never experienced any abuse. (PSR ¶ 54.)  Moreover, the Defendant was well educated, having obtained a bachelor's degree in Nigeria and starting his master's degree before moving to the United States. (*Id.* ¶ 60.)  In the United States, the Defendant had a full-time position as a caretaker for many years—a position he abused during the pandemic to commit fraud. (*Id.* ¶¶ 61-62.)  The Defendant had the ability and opportunity to lead a law-abiding life.  Yet, he chose to intimately participate in two separate fraud schemes.

The Defendant's choice to continue to engage in fraud even after being alerted that law enforcement was investigating him is emblematic of his disrespect for the law.  While the

8

Defendant's lack of criminal history weighs against a high-end of the Guidelines sentence, his choice to re-engage in fraud and opportunistically switch to a different fraud scheme—obtaining unemployment insurance debit cards—demonstrates why this is a Defendant that needs the strongest specific deterrent.  The Defendant must be shown that the choice to engage in fraud is one that will not be tolerated by society—whether the victims of his harm are elderly individuals or government programs intended to assist the less fortunate.  A high-end of the Guidelines sentence will show this Defendant that should he ever again choose to engage in criminal conduct that this choice will be met with stiff punishment—punishment that will only increase with each subsequent conviction.  By providing this strong specific deterrent, the Court will also protect the public from future crimes of this Defendant.

General deterrence is equally important with defendants who engage in social media scams. Scammers pay attention to successful fraud criminal prosecutions and the sentences imposed on these defendants.  On Akinyemi's phone, law enforcement recovered a photograph containing a news blurb with a headline that read in part: "The scams reached from Greenbelt, College Park and Bowie to South Africa, West Africa and Europe." (Ex. B.)  Law enforcement located the news clip online, which was a news story about multiple individuals prosecuted in this Court for engaging in an online fraud scheme. *See* "Greenbelt man ran global 'spearphishing' email scam, nets millions," *WUSA9*, https://www.wusa9.com/article/news/global-spearphishing-email-scam-depended-on-flashy-24-year-old-greenbelt-man-to-move-millions/65-57884830-0a6a-492c-835a-1910e04f24a8 (last visited April 15, 2022); *see also United States v. Fomukong, et al.*, Crim. No. PWG-17-661.  Law enforcement also recovered another photograph containing the news article title: "Nigerian man sentenced to 11 years in U.S. prison for international fraud, money laundering scheme coordinated by Black Axe group." (Ex. C.)  This evidence speaks to the need

for general deterrence and the impact that it can have. A high-end of the Guidelines sentence by this Court will show others who are engaging in similar criminal conduct that their decision to partake in such crime will be met with significant punishment.

Accordingly, the Government submits that a sentence of 78 months in prison is sufficient, but not greater than necessary in light of the nature and circumstances of these offenses, the need for just punishment, the Defendant's disrespect for the law, the need to provide adequate specific and general deterrence, and to protect the public from future crimes of the Defendant.

### IV. Forfeiture Judgment and Restitution

The Government asks the Court to incorporate the motion for forfeiture of property and preliminary order of forfeiture, filed on March 9, 2022, into the sentencing proceeding. (ECF No. 34.) Pursuant to the parties' plea agreement, the Defendant has agreed to the entry of a restitution judgment in the amount of $486,119.07.

### V. Conclusion

For the foregoing reasons, and additional information that may be presented at the sentencing hearing, the Government respectfully submits that a sentence of **78 months in prison, followed by 3 years of supervised release**, is sufficient but not greater than necessary to meet the purposes of sentencing as enumerated in the § 3553(a) factors.

Respectfully submitted,

Erek L. Barron
United States Attorney

By:  \_\_\_\_/s/_____
Rajeev R. Raghavan
Assistant United States Attorney